## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE ESTATE OF JON LEON WATSON by and through its Administrator ad Prosequendum, HELEN RAY LLOYD, and HELEN RAY LLOYD, in her own right, | :<br><br>:<br><br>: | Hon. Joseph H. Rodriguez<br><br>Civil Action No. 16-6578 |
| Plaintiffs, | : | **OPINION** |
| v. | : | |
| CUMBERLAND COUNTY, et al., | : | |
| Defendants. | : | |

This matter is before the Court on Motions for Summary Judgment filed by Defendants (1) CFG Health Systems, Inc. [Dkt. No. 124]; (2) Cumberland County and Warden Robert Balicki (collectively "Cumberland County Defendants") [Dkt. No. 126]; and a Motion for Summary Judgment filed by Plaintiff, the Estate of Jon Leon Watson [Dkt. No. 125]. The Court has considered the written submissions of the parties, as well as the arguments advanced at the hearing on December 10, 2019. For the reasons stated on the record that day, as well as those that follow Cumberland County Defendants' and Defendant CFG's Motions will be granted and Plaintiff's Motion will be denied.

## I.     Background

This case deals with the circumstances surrounding the unfortunate suicide of Mr. Jon Leon Watson ("Mr. Watson") while he was incarcerated at the Cumberland County Jail on June 3, 2016. This action is brought on behalf of Helen Ray Lloyd, the mother of Mr. Watson's children, as duly appointed Administrator of Mr. Watson's Estate ("Plaintiff"). Plaintiff brings this action against Cumberland County Jail ("Cumberland County"); CFG Health Systems, Inc ("CFG"), the provider of health

services at Cumberland County Jail; and Warden Robert Balicki ("Warden Balicki"), the Warden of the Cumberland County Jail while Mr. Watson was in custody (collectively the "Defendants"). The following facts are relevant to the motions pending before the court.[1]

### A. Mr. Watson's Experience & Medical Record while at the Cumberland County Jail

"Decedent, Jon Watson, was committed to the Cumberland County Jail on May 18, 2016. His New Admittance Initial Intake Medical Screening was completed by Corrections Officer Shin-an at 11:15 p.m." (Pl. SMF ¶ 1). During the intake process, officers question new inmates utilizing a questionnaire form to assist their observations of the new inmate. (Cumberland Defs. SMF ¶30-42). When Mr. Watson was asked these questions, he responded yes to (1) having a serious illness; (2) taking medication; and (3) having a mental disability. (Pl. SMF ¶ 2). Early the next day, "Advanced Practice Nurse April Munson issued Orders related to Watson's alcohol and opioid withdrawal at 4:35 am." (CFG SMF ¶ 23). At 10:30am, Mr. Watson's "Intake Mental Health Screening and Assessment," was completed , which showed Mr. Watson was anxious, afraid, or angry and was acting and/or talking in a strange manner. (Pl. SMF at ¶¶ 6-7). The Nurse conducting the assessment, Ms. Fedd, noted in "summary" mental health problems required follow up and, in "disposition," referred Mr. Watson for Mental Health Housing "ASAP." (Id.). She commented: "Depression, Bipolar, Schizophrenia." (Id.). That same day, Mr. Watson was seen by a psychiatrist Dr. Khalid Bajwa ("Dr. Bajwa").

---

[1] In addition to the exhibits produced in support of the Motions before the court, the Court recites the relevant facts taken from the parties statements of undisputed facts: Plaintiff's Statement of undisputed facts (hereinafter "Pl. SMF"); Defendant CFG's Statement of undisputed facts (hereinafter "CFG SMF"); Defendants Cumberland County and Warden Balicki's Statement of undisputed facts (hereinafter "Cumberland Defs. SMF").

Dr. Bajwa placed Mr. Watson on Suicide Watch Level 2—watch level 2 entails 30 minute checks on the inmate—and proscribed him 2 mg of Risperdal and 50 mg Benadryl. (Id. at ¶ 8).

Later that night, Dr. Bajwa reevaluated Mr. Watson, reduced his suicide watch to Level 3, and diagnosed Mr. Watson with mood disorder, psychosis NOS and alcohol and opioid dependence.[2] (CFG SMF ¶ 34). Mr. Watson reported no suicidal or homicidal ideation or plan, and denied any history of suicide attempts to Dr. Bajwa. Between May 22, 2016 and June 1, 2016, Mr. Watson was examined and revaluated on multiple occasions. (Id. at ¶ 28). According to CFG records, "he was seen up to three times per day on May 19, 21, 22, 23, 24, 25 and 26 for check of vital signs --blood pressure (standing and sitting), pulse, respirations and temperature--and hydration." (Id.). In monitoring his drug and alcohol withdrawal, Mr. Watson was asked on a number of occasions "if he was having difficulty adjusting to jail, felt overwhelmed, hopeless or had thoughts of hurting himself." (Id. at ¶ 30).

On May 21, 22, 24 and 25 Mr. Watson reported complaints "ranging from blood in the stool to possible seizure to dizziness" to CFG personnel. (Id. at ¶ 39; Cumberland Defs. SMF ¶¶ 96-102). On each of those occasions, Cumberland County personnel sent him to Medical. (Cumberland Defs. SMF ¶¶ 96-102). Following an incident of possible seizure on May 21st, Mr. Watson was seen and cleared by medical. On May 22, 2016, Dr. Bajwa saw Mr. Watson at approximately 8:50 am. At that time, Dr. Bajwa noted that Mr. Watson was in good spirits and stated that his current medicines were helping, he denied any suicidal intent or plan. (CFG SMF ¶ 36). Dr. Bajwa withdrew Mr. Watson

---

[2] Level 3: 30-minute checks are performed on inmates, who are issued standard jail uniform, bedding and receive regular food tray and eating utensils. (Cumberland Defs. SMF 54).

from Level 3 Suicide Watch and cleared him for general population, continuing his medication. (Id. at ¶ 37). Mr. Watson was then seen by Dr. Larry Pettis for a physical assessment on May 23rd. (Id. at ¶ 38).

On May 25, 2016, medical was called to Mr. Watson's cell for a possible seizure. When nurses arrived, Mr. Watson was sitting upright, he showed no signs of a seizure or distress. Mr. Watson was taken to medical and housed in infirmary. (J.L. Watson CCCF 30, interdisciplinary progress notes). Medical was called back to his cell later that day for another potential seizure and taken to medical for an assessment. There, Mr. Watson stated he was going to get into a fight with another inmate so he "faked it." (Id.). Mr. Watson also reported hearing voices and "underwent a suicide screening, it was noted that he was seen by mental health and placed on suicide watch level 1 ('S/W Level 1') with 15-minute checks." (CFG SMF at ¶ 40). Mr. Watson stated that the voices told him they were coming to get him, and his suicide screening form specifies that he said: "he don't want to kill himself but he will if that would save the world." (CC [Watson] – 00281, 300). The same day, Cumberland County Personnel observed Mr. Watson banging his head on the door of his cell and yelling, he was taken to medical for trying to hurt himself. (JL Watson CCCF 28, interdisciplinary notes; CC [Watson] – 00394). According to Cumberland County's Incident Report, when Mr. Watson returned to his B-Pod (on level I watch) he continued to bang his head. Cumberland County officers proceeded to place Mr. Watson in the restraint chair. (CC [Watson] – 00394-405). Mr. Watson "calmly sat in the chair and allowed officers to properly restrain him." (Id.). He remained in the restraint chair for about three hours. (Id.)

Cumberland County Sargent observed Mr. Watson again continually banging his head and proceeded to pepper spray him to "stop him from hurting himself." (Pl. SMF ¶

17). Mr. Watson was sent to medical, where his eyes were flushed with water. He was then placed into the restraint chair without incident, where he remained for approximately three and a half hours. (Id. at ¶¶ 17-18). He was put back into the restraint chair later that day. (Id. at ¶ 20). "Watson was evaluated every 15 minutes while in the restraint chair." (CFG SMF n.2). "On May 27, 2016, Dr. Bajwa provided a telephone order for immediate ("STAT") doses of Haldol 5 mg and Benadryl 50 mg as well as doses twice per day for 30 days ("BID x 30 days")." (Id. at ¶ 43). Dr. Bajwa evaluated Mr. Watson on the morning of May 29, 2016; her notes acknowledge that Mr. Watson "was pepper sprayed and placed in a restraint chair by custody. . . . had been placed on 1:1 suicide watch and had reported auditory hallucinations." (Id. at ¶¶ 45-46). Dr. Bajwa also noted that Mr. Watson denied any current suicidal or homicidal ideation, intent or plan, and reported no hallucinations or medication side effects. (Id. at ¶ 47). Mr. Watson reported to Dr. Bajwa that he had a problem with another inmate but that he "feels better now." (Id. at 48). Dr. Bajwa removed Mr. Watson from 1:1 suicide watch but he continued on Level 1 suicide watch. (Id. at ¶ 49).

Dr. Bajwa saw Mr. Watson again the following day, at which time he denied suicidal or homicidal ideation, intent or plan, and further denied any hallucinations or delusions. Dr. Bajwa placed Mr. Watson on Level 2 Suicide Watch. (Id. at 73-74). On May 31, 2016, psychologist JoAnne Gonzalez, Ph.D., met with Mr. Watson. At that time, she noted that Mr. Watson had no suicidal or homicidal intent or plan, and denied hallucinations or delusions. (Id. at ¶¶ 75-76). Dr. Gonzalez's discontinued Level 2 Suicide Watch, switching Mr. Watson to Level 3 Suicide Watch and continuing his medications. (Id. at 77). The next day, Dr. Gonzalez decided to clear him for general population and lock down from recent charges, he was to continue his medications.

Medical again assessed Mr. Watson on June 2nd and 3rd. On June 2, 2016, Mr. Watson "was seen by CFG for another apparent seizure, where he stated he felt dizzy and fell but no injuries were found."(Cumberland Defs. SMF ¶ 124). Mr. Watson indicated he stood up too fast and was "not suicidal or homicidal." (J.L. Watson CCCF 35). On June 3, 2016, Mr. Watson reported another alleged seizure after returning from his court appearance that morning. Specifically, while a CFG nurse was administering his medication, she saw Mr. Watson lying on the ground with "foot and hand twitching." (J.L. Watson CCCF 34). LPN Fedd thought, based on her observations and experience, that Mr. Watson performed a fake seizure. (Id.). He was taken to medical where he was evaluated and was found to be stable. Mr. Watson mentioned being at court earlier that morning and stated that it "wasn't good." When asked if he felt suicidal, he indicated that he did not. (CC [Watson] – 00027). At some point Mr. Watson was brought back to his cell.

On that same day, June 3, 2016 at 12:01 p.m., "Inmate Luis Colon walked past Mr. Watson's cell while distributing lunch trays. In his statement, Inmate Colon testified that he saw Mr. Watson hanging and that he gestured to Officer Rowe and told Officer Rowe that Mr. Watson was "hanging out.'" (Pl. SMF 33). After five minutes, Officer Rowe looked into Mr. Watson's cell, at 12:06 p.m. (Id. at ¶ 34). At that moment, Officer Rowe radioed a code. He entered the cell but did not initiate CPR, he "panicked". (Id. at 35-36). CFG medical staff reported to Mr. Watson's cell with emergency equipment. (J.L. Watson CCCF 34). They performed CPR until EMT arrived on scene (Id.). Mr. Watson was pronounced deceased, and his death was ruled a suicide by hanging.

Mr. Watson's mother testified that he loved his children and his girlfriend. (Dep. 30). She did not know of any reason that Mr. Watson would commit suicide, though she

believed he was at risk of suicide. She did not believe that he would commit suicide in jail, in 2016. Mr. Watson's girlfriend, Hellen Ray Lloyd ("Ms. Lloyd") testified that he had been to the psych ward, she had "him committed two times," around 2005 and again in 2009 at Inspira hospital. (Lloyd Dep. 62). Ms. Lloyd also testified that in 2009 Mr. Watson was "talking suicidal." (Id. at 64). She does not know of any attempts of suicide. (Id. at 63).

### B. Cumberland County Jail's Policies & Officer Training

Relevant to the Court's discussion is Cumberland County's restraint chair policy, Policy Number 10.22, which establishes how and when the restraint chair may be utilized. (Ex. D to [Dkt. No. 125] Policy 10.22). The Cumberland County Jail policy on the use of the restraint chair mandates that a shift commander can approve use of the restraint chair on a temporary basis only and must get approval from the Warden or Captain." (Pl. SMF ¶ 21). It allows for the restraint of an inmate when the inmate (1) is combative and shows signs of imminent violence, (2) is inflicting wounds upon themselves and will not stop the behavior, (3) has attempted suicide and it is clear that they will continue to take their own life; and (4) has destroyed government property and will not stop the behavior. (Id.). According to the policy, "[a]ll incidents involving the use of the Inmate Restraint Chair must be carefully documented and video recorded unless it is determined by the Shift Commander that a delay would constitute a serious hazard to the inmate or staff or would result in major disturbance with serious property damage." (Ex. D to [Dkt. No. 125] Policy 10.22). Once the inmate is placed into the restraint chair, medical's responsibility was to assess the inmate's condition and check vital signs. The inmate is placed on a 1 on 1 level watch while in the chair, offered 3 meals and opportunity to use the bathroom. "Recommendation for release from the

Inmate Restraint Chair must be made by the Shift Commander, Physician or Mental Health Staff." But the "Inmate shall not be removed . . . without approval from the Warden Captain." (Id.).

CFG also maintains a policy addressing restraint and seclusion, Policy I-01. (Pl. Ex. G to [Dkt No. 125] CFG Policy I-01). The purpose of the policy is as follows: "To differentiate the use of restraints as ordered by custody from restraints or seclusion as ordered by clinical and to define the role of health care personnel at the Cumberland County Department of Corrections [CCDOC] in monitoring inmate/ patients while restrained." (Id.). According to the policy, the health care staff does not use medial restraints, and the mental health clinical staff does not allow the use of physical restraints. In the case where any patient is threatening staff, other inmates, or themselves or others, the Department of Corrections staff will escort them to Inspira ER for evaluation; CFG mental health staff "will order the transfer of the inmate/patient to the Emergency Room." (Id.). The use of restraints by security staff, however, "is governed by approved correctional policies and procedures." (Id.). The policy provides that (1) the "health record is reviewed for any contraindications to use and/or required accommodations which are reported to custody staff and (2) if restraints are improperly utilized and are jeopardizing the health of the inmate/patients, health staff will communicate their concerns to custody staff as soon as possible." (Id.).

"The 'emergency situations' category of the[Cumberland County] jail policy includes a suicide precaution/prevention." (Cumberland Defs. SMF ¶ 40). The "Suicide Precautions" policy, Number 11.7, is in place in "order to ensure the safety and well-being of inmates who may pose a suicide risk." (Dkt. No. 127, Ex. 12, Cumberland County jail policy 11.7). Pursuant to this policy, inmates were to be interviewed four

times within 2 weeks, beginning at intake for suicide screening purposes. (Id.). IT provided that when an inmate "is placed on suicide watch, close observation, or special watch by a staff member, a written detailed report must be submitted to the Shift Commander. The suicide levels are defined as follows: (1) "Level 1: 15-minute checks are performed on inmates, who are only provided a suicide gown and finger foods;" (2) "Level 2: 30-minute checks are performed on inmates, who are provided with standard jail uniform, bedding and finger foods;" (3) "Level 3: 30-minute checks are performed on inmates, who are issued standard jail uniform, bedding and receive regular food tray and eating utensils; and" (4) "1 on 1 Observation: inmates monitored at all times and are provided suicide safe gown and finger foods for all meals." (Id; Pl. SMF ¶ 53). "Only a qualified mental health professional may remove an inmate from suicide watch at the jail." Id. Finally, the Cumberland County Policy Number 11.7 details procedures to follow in the event that an officer discovers an inmate attempting suicide and when an inmate is pronounced dead as a result of suicide.

"All correction officer hires are required to undergo 120 hours of training with the Police Training Commission prior to attending the Academy, which included 80 hours of classroom training and 40 hours of on the job training." (Cumberland Defs. SMF ¶ 25). Warden Balicki testified that officers were trained on CPR. (Balicki Dep. 18:6-13). He testified that newly hired officers are provided with a training manual. (Cumberland Defs. SMF ¶ 32-33). Warden Balicki did not have a way of testing officers on the manual. [Dkt. No. 136-1 at ¶ 33].

## II.     Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party

is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed.

R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986). Credibility determinations are the province of the factfinder. Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.   Analysis

**A. Defendants Cumberland County's and Warden Balicki's Motion**

Defendants Cumberland County and Warden Balicki argue that Plaintiff's claim

under 42 U.S.C. § 1983 must be dismissed against both Defendants because (1) they did

not act with deliberate indifference towards Mr. Watson, and (2) Defendants have

Qualified Immunity. [Dkt. No. 126]. Cumberland County and Warden Balicki further

move for summary judgment on all of Plaintiff's state law claims, including violation of

the New Jersey Civil Rights Act, wrongful death & survivorship claims, and negligence

claims, and all claims against the unknown correction officers.

Plaintiff not only opposes this motion but has filed her own Motion for Summary Judgment [Dkt. No. 125], in which she seeks judgment as a matter of law against Cumberland County and Warden Balicki, on her claims under § 1983. Because of the overlapping nature of the motions pending before the Court, first, the Court will address Plaintiff's federal claims and resolve the issue of whether there is a genuine dispute of material fact regarding Plaintiff's § 1983 claims against Cumberland County Defendants. Then, the Court will address the state law claims against them. Finally, the Court will address the arguments advanced by and against Defendant CFG.

Plaintiff seeks to hold Cumberland County Defendants, including unknown corrections officers, liable under 42 U.S.C.§ 1983 for the alleged deprivation of Mr. Watson's Constitutional Rights in failing to prevent his suicide.[3] It is well established in the Third Circuit that "when a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment." Palakovic v. Wetzel, 854 F.3d 209, 223–24 (3d Cir. 2017) (citing Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir. 1988) ("Colburn I"). Accordingly, Plaintiff must prove that the defendants' conduct was so cruel or unusual that it "shocks the general conscience" or is "intolerable to fundamental fairness." Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970).

In Monell v. New York City Dept. of Social Services, the Supreme Court of the United States concluded that, "a local government may not be sued under § 1983 for an

---

[3] Plaintiff does not dispute that the claims brought against the unknown corrections officers (John Does Correction Officers) should be dismissed at this juncture, and therefore, Count Two of Plaintiff's Amended Complaint will be dismissed.

injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 691–695 (1978). Therefore, to hold Cumberland County or Warden Balicki liable under § 1983, Plaintiff must show that the "governmental unit itself supported a violation of constitutional rights." Watson v. Abington Twp., 478 F.3d 144, 155 (3d Cir. 2007) (citing Monell, 436 U.S. at 691–695.[4] Where the official policy at issue "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014) (quoting Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir.1999)).

In Colburn I, this Circuit developed a standard for establishing liability for deliberate indifference in prison suicide cases; pursuant to that standard a plaintiff must show:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

---

[4] "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis—our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name." Monell, 436 U.S. at 691 n.55.

Id. (citing Colburn I, 838 F.2d at 669; Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) ("Colburn II"); and Woloszyn v. Cty. of Lawrence, 396 F.3d 314, 319–20 (3d Cir. 2005)). The court in Colburn II, further explained the requirements set forth in Colburn I by examining the line of cases from which the "theoretical underpinnings for that decision" arose. Those previous cases establish that "prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976) and Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 347 (3d Cir.1987) (MCI)).

The first element—that the individual has a "particular vulnerability to suicide"— denotes a serious medical need. See Colburn I, 838 F.2d at 669. It requires "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Colburn II, 946 F.2d at 1024 (quoting Torraco v. Maloney, 923 F.2d 231, 236 (1st Cir.1991)) (citing Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir.1990)).

As to element two—that the prison official knew or should have known of the individual's particular vulnerability—"should have known . . . does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991). "[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." Id. at 1025. In other words, plaintiff must show more than mere negligence by defendants in failing to appreciate a risk of suicide. The suicide risk must be (1) "so obvious that a lay person would easily recognize the necessity for' preventative action;"

and (2) "sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Id. (quoting MCCI, 834 F.2d at 347).

Finally, to prove element three "there must be a link between the prison official's knowledge and his disregard of the prisoner's particular risk. . . . similar to the 'deliberate indifference' standard applied to a claim brought under the Eighth Amendment, which requires the plaintiff to prove that the prison official "know[s] of and disregard[s] an excessive risk to inmate health and safety." Vargo ex rel. Vargo v. Plum Borough, 376 F. App'x 212, 216 (3d Cir. 2010) (quoting Woloszyn v. County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005).

In accordance with the applicable standard, Plaintiff initially argues that (1) there is no question that decedent, Jon Watson had a particular vulnerability to suicide. Mr. Watson "entered CCJ reporting heroin and alcohol addiction; reporting prior diagnosis of depression; bi-polar and schizophrenia; and further was classified during his Initial Mental Health Assessment as in need of an immediate mental health referral;" (2) the prison officials knew or should have known of Mr. Watson's particular vulnerability as the majority of his prison stay was spent on suicide watch; and (3) Cumberland County acted with reckless and/or deliberate indifference to Mr. Watson's serious medical needs when they violated policies and "punished" the decedent "for his mental illness." (Pl. Brf. [Dkt. No. 135] at 5-6; Pl. Brf. [Dkt No. 125]). More specifically, Plaintiff's argument is that Cumberland County and Warden Balicki were deliberately indifferent to the decedent for the failure to transfer him to Inspira Hospital despite his mental condition; restraining Mr. Watson in the inmate restraint chair, leaving him in that restraint, and pepper spraying him.

Pursuant to Monell, Plaintiff further contends the County and Warden Balicki supported this alleged violation of Mr. Watson's constitutional rights through their failure "to train their Corrections Officers on Suicide Prevention, CPR, and basic functions such as filling out intake forms," thereby depriving decedent of his constitutional rights through official policy. (Pl. Brf. [Dkt. No. 136] at 6). Therefore, the plaintiff must establish that the "deficiency in training actually caused the [prison guards'] indifference to [the prisoner's] medical needs." City of Canton, Ohio v. Harris, 489 U.S. 378, 379 (1989) ("[T]he identified deficiency in the training program must be closely related to the ultimate injury."). Finally, in a failure to train case, such as this one, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." Connick v. Thompson, 563 U.S. 51, 62 (2011) (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 409 (1997)).

Most notably, Plaintiff's arguments fail to name any individual correctional officers who allegedly violated Mr. Watson's constitutional rights. Instead, and to her detriment, Plaintiff generalizes the overall treatment of the decedent by all defendants and does not establish that any official committed a fourteenth amendment violation. [Dkt. No. 125-12 at 14]. First, Plaintiff vaguely suggests that a constitutional violation took place during the intake process, but provides no support. Despite Plaintiff's bare assertion that "[t]hrough discovery in this matter it is clear that the County and Warden Balicki failed to train their Corrections Officers on . . . basic functions such as filling out intake forms,"[5] she fails to show how. It does not appear that any intake forms were

---

[5] Plaintiff argues in her moving brief that despite alcohol and drug abuse, and signs of mental health issues, including previous diagnosis of depression, bi-polar and schizophrenia, during his

improperly filled out and, importantly, the record does not reflect that the intake process was deliberately indifference towards Mr. Watson. To the contrary, Plaintiff's intake forms were completed and, as a result, Mr. Watson was seen by CFG medical staff, evaluated by mental health personnel, and subsequently placed on Suicide Watch.[6]

The crux of Plaintiff's § 1983 claim pertains to the use of a restrain chair on Mr. Watson. Plaintiff argues that restraining the decedent was an act of punishment towards Mr. Watson for his mental illnesses and violation of jail policy. That characterization, however is misleading and substantially unsupported. Based on the record, Cumberland County correctional officers used an Inmate restraint Chair to prevent Plaintiff from banging his head against his cell door. (JL Watson CCCF 28, interdisciplinary notes; CC [Watson] – 00394-405). Despite Plaintiff's contention, the officers decision was in line with Cumberland County policy. Cumberland County's policy on restraining inmates states that the "[C]orrectional staff may utilize the Inmate Restraint Chair . . . [when] [t]he inmate is  inflicting wounds upon themselves and will not stop the behavior . . . [or] has attempted suicide and it is clear that they will continue to take their own life." (Ex. D to [Dkt. No. 125]) (emphasis added).

Plaintiff does not contend that this policy itself is improper; she argues that mentally ill inmates were not to be placed in the chair at all, and Mr. Watson in particular should not have been left in the chair but referred to Inspira. Absent any

_____

intake process, his medical needs were not appreciated or treated appropriately. To that extent, this argument does not concern Cumberland County—who consistently referred Plaintiff to CFG who in turn, treated Mr. Watson. Moreover, Plaintiff relies on her expert testimony that the decedent's medical treatment was insufficient. Plaintiff's Expert, Lawrence Guzzardi, M.D., is admittedly not a psychiatrist or psychologist. Guzzardi Dep. 108:5-9, 233:11-16, 242:-7.
[6] Though Cumberland County officers may not have recorded Mr. Watson's time spent in the restraint chair, which Plaintiff alleges, albeit briefly, a guard's mistake does not show inadequate training or supervision for a claim brought under § 1983." Blakeslee v. Clinton Cty., 336 F. App'x 248, 251 (3d Cir. 2009).

citation to the record, Plaintiff further denies that Mr. Watson was placed in the restraint chair for monitoring purposes. In advancing her arguments, Plaintiff improperly conflates the conduct and policies of Cumberland County Defendants and Defendant CFG. Jail policy does not institute a restriction on using a restraint chair for mentally ill inmates, nor does it require jail personnel to transfer an inmate to the hospital. Even if Mr. Watson should have been transferred to Inspira while he was restrained, Cumberland County relied on CFG's medical diagnoses and evaluations of Mr. Watson at that time, and throughout his incarceration. See Estate of Cills v. Kaftan, 105 F. Supp. 2d 391 (D.N.J. 2000) (finding County jail staff who acted in reliance on statements of nursing supervisor and social worker to the effect that inmate was no longer suicidal when transferring inmate from suicide watch to administrative segregation, did not act with deliberate indifference to possibility inmate might commit suicide). Therefore, Plaintiff has not provided sufficient evidence that any officer involved in the restraint of Mr. Watson was acting deliberately indifferent to his serious medical needs. To be sure, Plaintiff makes no claims that officers used excessive force and merely speculates that restraining Mr. Watson even contributed to his suicide.[7]

Moreover, even if Plaintiff could prove that restraining Mr. Watson was ultimately a violation of his fourteenth amendment right, she fails to prove Monell

---

[7] Plaintiff does cite to expert testimony by Dr. Jeffrey Schwartz to suggest that placing Mr. Watson in a restraint chair exhausted his mental illness further. The expert testifies about Cumberland County's policies and opines that, "the combination of the Jails failure to provide Mr. Watson with the mental health treatment except for psychotropic drugs combined with the jails shockingly punitive reaction to Mr. Watson's deteriorating mental health condition drove him to his suicide." [Dkt. No. 125-3, Ex. B]. This conclusory opinion is not based on any medical expertise and does not preclude summary judgment. In addition, Plaintiff briefly argues that pepper spraying Defendant also contributed to his suicide in a totality of events, however, he was pepper sprayed for the same reason he was restrained—to prevent him from harming himself. Plaintiff provides nothing to dispute this fact.

liability. Plaintiff alleges that Cumberland County Defendants are liable under § 1983 for a failure to train officers on suicide prevention. Though this type of training can be linked to the decedent's injury, as he ultimately committed suicide, and arguably could have a connection to the decision to place Mr. Watson in the restraint chair, Plaintiff presents insufficient evidence any such failure was the moving force behind a constitutional deprivation.

Here, Plaintiff only generally avers that there was inadequate suicide prevention training. Without any citation to the record, Plaintiff claims Defendants "knowingly violated policies and procedures on a consistent basis. These violations lead to a culture of indifference in the Jail which was allowed to thrive by Cumberland County, as there were no consequences given to those who did not follow the policies and procedures." [Dkt. No. 125-13 at 14]. Plaintiff provides no evidence of the alleged culture of indifference. Rather, Plaintiff emphasizes that Mr. Watson's suicide is the fourth suicide at Cumberland County in under two years and argues that no changes were made to jail policies and no additional training was provided to officers following any of the previous suicides. The record is devoid of any evidence pertaining to the similarities of any past suicides. Furthermore, Plaintiff fails to identify any "specific training not provided that could reasonably be expected to prevent the suicide that occurred." Joines v. Twp. of Ridley, 229 F. App'x 161, 163 (3d Cir. 2007). "It is not enough for Plaintiff to show that the [county's] 'employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'" Id. (quoting Colburn II, 946 F.2d at 1029–30).

The record reflects that Cumberland County officers received a copy of the training manual and policies. Officers completed in class and on the job training, first aid and CPR. Officers received suicide prevention training, amongst other ongoing training. There is no dispute that Mr. Watson was <u>not</u> on suicide watch the day of his suicide. He was off of suicide watch for over 24 hours. He was seen by medical the days leading up to the suicide and hours before that suicide. On those occasions, Mr. Watson did not present suicidal ideations—nor did he present ideations once while incarcerated. He was taking his medications. The record also demonstrates that Mr. Watson's overall condition was taken seriously during his incarceration. Each time Mr. Watson reported medical complaints to Cumberland County personnel, CFG was contacted and Mr. Watson was seen by Medical. Plaintiff does not allege that while on suicide watch Cumberland County failed to make the appropriate accommodations or cell checks. In addition, Plaintiff does not establish that any officers tasked with monitoring Mr. Watson the day he passed, knew or should have known that he was vulnerable to committing suicide.

Finally, Plaintiff argues that under <u>Monell</u>, Cumberland County Defendants are liable for the failure to train officers on CPR. It is undisputed that CFG offered additional CPR training for the Cumberland County officers, and that the County did not act on that opportunity. Plaintiff however, fails to account for the fact that officers received CPR training at the Academy or make any connection between a lack of CPR training and Mr. Watson's suicide. Again, Plainitff failed to provide more evidence than the availability of additional training. To that end, Plaintiff has not produced evidence that an officer's failure to perform CPR, or lack of training violated Mr. Watson's constitutional rights. At oral argument, Plaintiff stressed that the officer who found Mr.

Watson "panicked" when he saw the decedent in his cell unconscious, failing to start CPR, which he could not perform. However, according to Cumberland County policy, the officers reaction—to immediately call for medical and secure the cell—is all that was required. [Dkt. No. 125-5, Ex. D]. Plaintiff does not take issue with the jail's policy or dispute that medical staff immediately responded to Mr. Watson's cell and began CPR upon arrival.[8]

Accordingly, Plaintiff has not established any causal connection between the Cumberland County's actions in the course of its official training and Mr. Watson's suicide attempt, resulting in death. Thus, Plaintiff's general contentions are insufficient to establish <u>Monell</u> liability on this record. <u>See</u> <u>THE ESTATE OF DAVID HENNIS, et. al., Plaintiffs, v. WARDEN ROBERT BALICKI, et al., Defendants. Additional Party Names: CFG Health Sys., LLC, Patricia Hennis</u>, No. CV164216, 2019 WL 7047205, at *6 (D.N.J. Dec. 23, 2019) (granting summary judgment in favor of Cumberland County where Plaintiff failed "to offer any competent evidence regarding Cumberland County's customs and policies" and failed to demonstrate "that any official committed an underlying Fourteenth Amendment violation"). Therefore, summary judgment will be granted in Defendant Cumberland County's favor as to Count One.

As to Defendant, Warden Balicki, Plaintiff bases his liability upon the same allegations. To be sure, she does not differentiate between the Warden and Cumberland County in moving for summary judgment on her federal claims. Therefore, Plaintiff's claims against Warden Balicki fail for the same reasons that Plaintiff's federal law claims against Cumberland County fail. Plaintiff fails to establish a state actor who violated Mr.

---

[8] Under New Jersey law 10A:31-13.15.5(e), the Jail is required one CPR certified officer be present at all times.

Watson's constitutional rights, and even if there was a constitutional violation, fails to establish <u>Monell</u> liability for failure to train. Despite additionally alleging a failure to supervise, Plaintiff puts forth no argument or evidence that a policy or custom of failure to supervise existed or caused Mr. Watson's suicide. (<u>See</u> Pl. Brf. [Dkt. No. 125]; Pl. Brf. [Dkt. No. 136] at 9). Thus, summary judgment will be granted in favor of Defendant Balicki on Counts One and Three.

### B. Plaintiff's State Law claims Against Defendants Cumberland County & Warden Balicki

In addition to her federal claim, Plaintiff alleges state law claims against Cumberland County Defendants for violation of the New Jersey Civil Rights Act, N.J. Stat. Ann. 10:6-1, et seq. (Count Four), wrongful death (Count Five), survival action (Count Six), and negligence (Count Seven).

1. *New Jersey Civil Rights Act, N.J. Stat. Ann. 10:6-1, et seq.*

Claims under the New Jersey Civil Rights Act are analogous to Federal § 1983 claims; therefore, Plaintiff's state claim for violations of N.J. Stat. Ann. 10:6-1, et seq. fails for the same reasons that Plaintiff's § 1983 claim against Cumberland County Defendants fails, as stated above. <u>Pettit v. New Jersey</u>, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011). Accordingly, summary judgment will be awarded in Cumberland County's and Warden Balicki's favor, and Count Four will be dismissed.

2. *Wrongful death, Survival action, and Negligence*

To prevail on a claim for negligence Plaintiff must establish four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages. <u>Townsend v. Pierre</u>, 221 N.J. 36, 51 (2015). Cumberland County Defendants contend that Plaintiff fails to establish these elements for negligence liability and that her claim

is further barred by the New Jersey Tort Claims Act at N.J.S.A. 59:9-2(d). Plaintiff argues that Cumberland County Defendants had a duty to protect and ensure the welfare and wellbeing of all inmates at the County Jail and breached that duty "by ignoring the clear need for additional training for the corrections officers." [Dkt. No. 136 at 10]. Even if true, Plaintiff cannot establish a causal connection to that alleged breach and injury. Plaintiff's negligence claim rests on the same essential facts as her § 1983 claims. Those facts do not establish a connection between any failure to train and Mr. Watson's ultimate suicide. Therefore, the Court will grant summary judgment in favor of Cumberland County Defendants on Count Seven.

Plaintiff's claims for wrongful death and survival are derivative claims and thus, must be dismissed where underlying claims do not survive. Accordingly, the Court will also grant summary judgment as to Count Five and Six.

IV.    CFG's Motion for Summary Judgment

Plaintiff's Amended Complaint against Defendant CFG initially asserted state law claims for wrongful death and survival action based on professional negligence. [Dkt. No. 19].  CFG filed a Motion for Summary Judgment seeking dismissal of those claims for failure to file an affidavit of merit, on June 6, 2017. [Dkt. No. 33]. This Court granted that motion noting that the decision had no effect on any federal civil rights claim alleged. Estate of Watson by & through Lloyd v. Cumberland Cty., No. CV 16-6578, 2018 WL 1064208, at *3 (D.N.J. Feb. 27, 2018). The first basis for CFG's present Motion for Summary Judgment [Dkt. No. 124] is that Plaintiff does not assert any federal claims against it. After the Court's Opinion, Plaintiff did not amend her complaint further to assert her constitutional violation counts against Defendant CFG. No nurses, doctors or other CFG personnel are named as individual defendants in this matter. Her factual

allegations state in-part that "representatives of Defendant CFG, failed to properly screen Jon Watson for any suicidal tendencies, or any other psychological problems, and also failed to monitor Mr. Watson, even though they were aware of prior attempts to commit suicide by Mr. Watson;" and that representatives of CFG, demonstrated a deliberate indifference [Amend. Compl. ¶ 19]. CFG now argues, arguendo, that it is entitled to judgment as a matter of law on a claim under 42 U.S.C. § 1983 on two grounds (1) Plaintiff fails to show that CFG acted with Deliberate indifference to Plaintiff's medical needs; and (2) CFG cannot be vicariously liable for any individual's wrongful acts under § 1983 and Monell v. New York City Dept. of Social Srvcs., 436 U.S. 658 (1978).

In Plaintiff's Motion for Summary Judgment, she continues to conflate the parties. Though Plaintiff seeks summary judgement against all defendants, she primarily argues that "Cumberland County Defendants were recklessly and/or deliberately indifferent to the serious medical needs of Jon Watson." [Dkt. No. 125-13 at 6-11]. Plaintiff presents multiple pages of argument before generally asserting "[t]he treatment Mr. Watson received from Cumberland County and CFGHS is a clear example of their recklessness and deliberate indifference to the serious medical needs of their Inmates." Id. at 11. Plaintiff never refers to which Count in her Complaint holds CFG liable under § 1983.

The Court finds that Plaintiff has failed to properly allege a federal constitutional claim against Defendant CFG under § 1983. Plaintiff asserts federal constitutional violations in her First, Second and Third claim for relief. Plaintiff's First Claim for Relief is asserted against the County and Defendant Balicki. Plaintiff's Second Claim for Relief is asserted against John Doe and Corrections Officer 1-10. Finally, Plaintiff's Third

Claim for Relief is asserted against the Warden. There are no § 1983 claims alleged against Defendant CFG. Therefore, the Court will grant summary judgment in favor of Defendant CFG.

V.    <u>Conclusion</u>

For the forgoing reasons, the Court will grant Defendants Cumberland County and Warden Balicki's Motion for Summary Judgment [Dkt. No. 126] and Defendant CFG's Motion for Summary Judgment [Dkt. No. 124]. Thus, Plaintiff's Motion for Summary Judgment will be denied.

An appropriate Order will be entered.

Dated: January 9, 2020                      <u>/s/ Joseph H. Rodriguez</u>

                                           JOSEPH H. RODRIGUEZ, USDJ